**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William James THIGPEN, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Herman Campbell BARNETT, Jr., Defendant–Appellant.**

Nos. 91–3236, 91–8082.

United States Court of Appeals, Eleventh Circuit.

Oct. 22, 1993.

---

William M. Kent, Asst. Federal Public Defender, Jacksonville, FL, for William James Thigpen.

Robert W. Genzman, U.S. Atty., Mark Devereaux, Jacksonville, FL, for U.S. in No. 91–3236.

John R. Martin, Atlanta, GA, Nancy C. Rogers, Decatur, GA, for Herman Campbell Barnett, Jr.

Michael J. O'Leary, Asst. U.S. Atty., Atlanta, GA, for U.S. in No. 91–8082.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES, Circuit Judges.

BIRCH, Circuit Judge:

These cases require us to consider whether a defendant raising an insanity defense is entitled to an instruction informing the jury of the commitment procedure codified in the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 4241–47. We hold that a defendant is not entitled to such an instruction unless necessary to cure an erroneous view of the consequences of a not guilty by reason of insanity verdict due to inadmissible evidence or improper argument at the defendant's trial. We also direct district courts to instruct juries not to consider the consequences of a not guilty by reason of insanity verdict when that defense is presented.

## I. BACKGROUND

### A. *Barnett*

Appellant Herman Campbell Barnett, Jr., was convicted of four armed bank robberies. At trial, Barnett argued, as his only defense, that he was not guilty by reason of insanity. An expert presented by the defense testified that Barnett suffered from a chronic and severe case of post-traumatic stress disorder as a result of his experiences during three tours of duty as a combat soldier in Vietnam. Barnett requested the court to instruct the jury that if he was found not guilty by reason of insanity, he would not be released, but would be committed to a suitable medical facility until he proved that his release would not endanger himself or others. The district court denied the proffered instruction, ruling that "in deciding this case [the jury] should not be concerned with the effect of their verdict but merely its correctness." R5–467. The court charged the jury as follows.

> The question of punishment should never be considered by you in any way in deciding this case. If the defendant is convicted, the matter of punishment is for the Court to decide. As to any verdict you make, you should not be concerned with its consequences. You're to be concerned only with the correctness of any verdict that you make.

R5–529–30.

### B. *Thigpen*

William James Thigpen, a felon, illegally obtained three semi-automatic pistols. At times prior to trial, he resided in an adult congregate living facility for the mentally disturbed and at another medical facility. He complained of voices informing him that others were trying to kill him. Thigpen was charged with making false statements concerning his criminal background when purchasing the pistols and with illegally possessing those weapons after a felony conviction. His sole defense was insanity.

At trial, two psychiatrists testified that Thigpen suffered from a schizophrenic disorder. The jury also heard testimony that Thigpen had been diagnosed by no less than eleven psychiatrists as schizophrenic. During the prosecutor's cross-examination of the psychiatric expert called by the defense, the following transpired:

> Q: [Mr. Devereaux, Assistant United States Attorney] If Mr. Thigpen stays on

his medications, he's okay to go out in the world amongst society; correct? Is that your opinion?

A: He's not okay. He's stable and can function.

Q: Well, he's released from the hospital, he's on society?

R2–110–11. Defense counsel did not object following this exchange. The prosecutor also asked a series of questions aimed at eliciting an opinion as to whether a person suffering from schizophrenia would necessarily be unable to appreciate the nature of wrongfulness of his actions. The court overruled Thigpen's objections to these questions. The prosecutor was permitted to ask the government's expert a similar question on direct examination, again over Thigpen's objection.

Thigpen requested a jury instruction that if found not guilty by reason of insanity, he would "be committed to a suitable facility until ... it is found that he would not create substantial risk of bodily injury to another person or serious damage to the property of another." R1–26. The district court denied the proposed instruction.

Barnett's conviction was affirmed by a panel of this court. We vacated the panel opinion and consolidated Barnett's appeal with that of Thigpen, prior to the entry of an opinion in the latter case, for en banc consideration. *United States v. Thigpen,* 989 F.2d 1116 (11th Cir.1993).

## II.  JURY INSTRUCTION

Barnett and Thigpen argue that, upon request, a defendant presenting an insanity defense is entitled to an instruction that, if found not guilty by reason of insanity, the defendant is not released, but committed to a medical facility. This argument is premised first on the Insanity Defense Reform Act of 1984. Prior to the passage of this legislation, a defendant acquitted by reason of insanity in federal court was released.[1] In the absence of any federal provision for the confinement and treatment of defendants found not guilty by reason of insanity, the states

would frequently institute civil commitment proceedings against federal defendants released following an insanity verdict. *See United States v. McCracken,* 488 F.2d 406, 416–17 (5th Cir.1974). With the passage of the Insanity Defense Reform Act, however, a defendant acquitted by reason of insanity is committed to a medical facility for care and treatment until the court finds that his release will not "create a substantial risk of bodily injury to another person or serious damage of property of another due to a present mental disease or defect." 18 U.S.C. § 4243(d).

Prior to the passage of the Insanity Defense Reform Act, the former Fifth Circuit disallowed a requested instruction that the defendant would be committed to a psychiatric hospital if acquitted by reason of insanity. *Pope v. United States,* 298 F.2d 507 (5th Cir.1962), *cert. denied,* 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965). The defendants argue, however, that because of the commitment procedure established by the Insanity Defense Reform Act such an instruction should be granted upon request. The defendants augment this position with a second argument: an instruction regarding the consequences of an insanity verdict is required to correct the jurors' possible misconception that a not guilty by reason of insanity verdict will result in the release of an insane, potentially dangerous defendant.

■ The Insanity Defense Reform Act does not address the issue of whether the trial court should instruct the jury about the consequences of an insanity verdict. In the absence of any statutory provision speaking to this issue, Barnett and Thigpen rely on the following language from the Senate Committee Report on the Insanity Defense Reform Act:

The Committee endorses the procedure used in the District of Columbia whereby the jury, in a case in which the insanity defense has been raised, may be instructed on the effect of a verdict of not guilty by reason of insanity. If a defendant requests that the instruction not be given, it

---

1. The District of Columbia was the only federal jurisdiction with a statute providing for commitment after an acquittal by reason of insanity.

*See United States v. McCracken,* 488 F.2d 406, 415–17 (5th Cir.1974).

is within the discretion of the court whether to give it or not.

S.Rep. No. 98–225, 98th Cong., 2d Sess. (1983), *reprinted in* 1984 U.S. C.C.A.N. 3182, 3422. A committee report does not have the force of law, nor does this statement purport to explain ambiguous or vague language appearing in the statute. "While a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an *independent statutory source having the force of law*." *International Bhd. of Elec. Workers Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987). "[A] cardinal principle of the judicial function of statutory interpretation is that courts have no authority to *enforce* principles gleaned *solely* from legislative history that has no statutory reference point." *Id.* In the absence of any statutory provision addressing the issue, we conclude that the Insanity Defense Reform Act does not require the trial court to instruct the jury about the consequences of a not guilty by reason of insanity verdict. *Accord United States v. Shannon,* 981 F.2d 759, 763–64 (5th Cir.1993), *petition for cert. filed,* —— U.S.L.W. —— (April 12, 1993) (No. 92–8346); *United States v. Frank,* 956 F.2d 872, 881–882 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992).

Nor are we persuaded that an instruction is required to correct the jury's possible misconception concerning the fate of a defendant acquitted by reason of insanity. The former Fifth Circuit held that "[e]xcept where a special statutory provision mandates a jury role in assessment or determination of penalty, the punishment provided by law for offenses charged is a matter exclusively for the court and should not be considered by the jury in arriving at a verdict as to guilt or innocence." *McCracken,* 488 F.2d at 423.

> Unless otherwise provided by statute, it is the duty of the court to impose sentence, or make such other disposition of the case as required by law, after the facts have been decided by the jury. To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for a parole, or other matters relating to disposition of the defendant, tend[s] to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.

*Pope,* 298 F.2d at 508; *See also Rogers v. United States,* 422 U.S. 35, 40, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) ("jury [has] no sentencing function and should reach its verdict without regard to what sentence might be imposed").

Moreover, the fact that, since *McCracken* and *Pope,* Congress has established a procedure for the automatic commitment of a defendant acquitted by reason of insanity does not alter this principle. In *McCracken,* the jury was informed that the defendant, if found not guilty by reason of insanity, would be turned "a loose." 488 F.2d at 424. Although this was an accurate summary of federal law at the time of McCracken's trial, the former Fifth Circuit reversed the conviction.

> [A]pplication of the principle that it is error to instruct the jury on punishment or consequences of a certain verdict does not depend on the correctness of the information imparted to the jury. It is error to tell the jury about the consequences of a certain verdict even if they are mandatory. It was as erroneous for the trial judge to tell the jury that McCracken would be released if found insane as it would have been to tell them that the court intended to impose a life sentence if he were found guilty of murder in the first degree.

*Id.* at 425 (citations omitted). The instruction requested by Barnett and Thigpen would require us to disregard the established canon that juries are not to be informed of or concerned with the consequences of their verdicts.

Furthermore, the defendants' argument asks that we undermine another settled principle of law: juries are presumed to follow the court's instructions. *See, e.g., United States v. Saldarriaga,* 987 F.2d 1526, 1532 (11th Cir.1993) (per curiam); *United States v. Simon,* 964 F.2d 1082, 1087 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct.

1854, 123 L.Ed.2d 476 (1993); *Adams v. Wainwright,* 709 F.2d 1443, 1447 (11th Cir. 1983) (per curiam), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). The jury that found Thigpen guilty was instructed that "the question of punishment should never be considered by the jury in any way in deciding the case. If the Defendant is convicted the matter of punishment is for the Judge to determine." R1–23.[2] Similarly, in Barnett's case, the jury was charged not to consider matters of punishment. Barnett's jury was also instructed that it should not be concerned with the *consequences* of its verdict. The hidden premise of the defendants' argument is that jurors will violate both the court's instructions and their oath to render a verdict based on the facts without consideration of the consequences. We are not convinced that the risk that jurors may erroneously believe that a defendant acquitted by reason of insanity is released warrants dispensing with this circuit's precedents, which teach that juries are not to be concerned with the consequences of their verdicts and that, if so instructed, juries are presumed to render verdicts without doing so. Juries are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense.[3] We decline to assume the task of distinguishing those dispositional consequences of which the jury should be advised. An instruction informing the jury that a defendant found not guilty by reason of insanity will be committed to a psychiatric facility all but invites the jury to consider the likelihood and timing of his release. We therefore hold that a defendant is not entitled upon request to an instruction concerning the consequences of an insanity verdict.

Moreover, we are also concerned that where the jury is *only* instructed not to consider the punishment occasioned by its verdict, the jury may feel permitted, at least tacitly, to consider the consequences of a not guilty by reason of insanity verdict. Accordingly, to prevent any such speculation, we direct district courts to specifically instruct juries not to consider the consequences of a not guilty by reason of insanity verdict when that defense is presented.

■ As an alternative position, the defendants contend that an instruction as to the consequences of an insanity verdict would be appropriate where the evidence tends to show that the defendant is prone to uncontrolled, violent conduct. According to this argument, both Barnett, who was convicted of multiple armed robberies, and Thigpen, who illegally possessed firearms while under the influence of voices telling him that others intended to hurt him, would be entitled to an instruction regarding the consequences of an acquittal by reason of insanity. We reject this argument and hold that the general rule against informing jurors of the consequences of a verdict governs such cases. We do think, however, that this general rule admits of one exception. If a witness or the prosecutor states or implies that the defendant would be released if found not guilty by reason of insanity, a curative instruction would be appropriate to ensure that the jurors are not misled into an erroneous view of the consequences of such a verdict. The rule articulated in *McCracken,* which we confirm today, requires no less nor permits any more. A curative instruction regarding the consequences of an insanity verdict is appropriate where the jury hears inadmissible evidence or improper argument or questions by the government from which it may infer that the defendant will be released as a consequence of an insanity verdict. *Accord Evalt v. United States,* 359 F.2d 534, 544–46 (9th Cir.1966) (reversing conviction based on district court's failure to instruct the jury regarding commitment procedure that would follow an insanity

---

**2.** This charge tracks the language of this circuit's pattern instruction. Pattern Jury Instructions, Basic Instruction 10.4 (Eleventh Circuit District Judges Ass'n 1985).

**3.** "The jurors decide the facts in accordance with the rules of law as stated in the instructions of the Court. The Court imposes sentence or makes such other disposition of a defendant as required by law. This is eminently sensible and in the absence of a statutory requirement there is no duty on the Court to inform the jury of what would happen to a defendant if this or that finding is made by them." *White v. United States,* 387 F.2d 367, 367–68 (5th Cir.1967) (per curiam).

verdict where the prosecution was allowed to comment upon the consequences of the verdict).[4] Such an instruction may vary as necessary to cure the specific error committed at trial, but should generally inform the jurors that, if found not guilty by reason of insanity, the defendant will be committed to a medical facility until the court determines that the defendant's release would not pose a substantial risk of bodily injury to another person or serious damage to property of another due to a then present mental disease or defect.

■ Barnett does not suggest that the evidence or arguments at his trial misled the jury as to the consequences of a verdict of not guilty by reason of insanity. Thigpen argues, however, that the prosecutor's questions suggested that he would be released if acquitted by reason of insanity. The prosecutor asked the defense expert whether Thigpen would be suitable for release "out in the world amongst society" if he "stays on his medications." R2–110. As a followup question, the prosecutor remarked "he's released from the hospital, he's on society?" Id. at 111. Thigpen neither objected nor requested a curative instruction following these remarks. He instead allowed these questions and the answers of the witness to remain in evidence and did not specify the conduct of the prosecutor as a ground for giving his proposed instruction on the consequences of an insanity verdict.

Because Thigpen did not contemporaneously object to these questions, we determine only whether the district court's failure to give a curative instruction *sua sponte* constitutes plain error. The prosecutor's questions do not clearly suggest that, following an insanity verdict, the defendant would enjoy the sporadic and unrestrained psychiatric care that he had received in the past. Any error was therefore not clear or obvious. *United States v. Olano*, ——— U.S. ———, ———, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993). Further, Thigpen has not shown that the prosecutor's questions affected the outcome of the case or otherwise implicated his substantial rights. *Id.* at ———, 113 S.Ct. at 1778; Fed.R.Crim.P. 52(b). Therefore, in neither Barnett nor Thigpen's case does the failure of the respective trial courts to instruct the jury regarding the consequences of an insanity verdict require reversal.[5]

## III. EXPERT TESTIMONY

■ Thigpen contends that, in violation of Federal Rule of Evidence 704(b), the district court allowed the government to elicit expert testimony as to his ability to appreciate the nature or wrongfulness of his actions. "No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed.R.Evid. 704(b). At trial, Thigpen sought to prove as an affirmative defense that "at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his

4. Similarly, of those states that do not automatically give an instruction regarding the consequences of an insanity verdict upon request, several allow such an instruction to cure an erroneous view of the consequences of such a verdict. *See, e.g., Dipert v. State*, 259 Ind. 260, 286 N.E.2d 405, 407 (1972) ("[A] defendant, through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of [post-trial confinement] procedures where an erroneous view of the law on this subject has been planted in their minds."); *State v. Huiett*, 271 S.C. 205, 246 S.E.2d 862, 864 (1978) ("[U]nless the commitment charge is curative under the circumstances of a particular trial or is required to clarify a misstatement of the law and can be given without legal prejudice to either appellant or the State, the rule that the

jury is not concerned with the disposition of the defendant is applicable....").

5. Barnett also contends that he was not tried within the period required by the Speedy Trial Act, 18 U.S.C. § 3164(b). The panel opinion rejected this argument, reasoning that the Speedy Trial Act allows the district court to toll the trial deadline during the period associated with Barnett's psychiatric examination as it related to his insanity defense. We reinstate the panel's treatment of this issue as set out under roman numeral "I" in the panel opinion. *See United States v. Barnett*, 968 F.2d 1189, 1190–91 (11th Cir.1992), *vacated, reh'g en banc granted*, 989 F.2d 1116 (11th Cir.1993).

acts." 18 U.S.C. § 17. The psychiatric experts offered by the government and the defense both testified that Thigpen suffered from schizophrenia. When cross-examining the defense's expert, the prosecutor asked a series of questions to elicit an opinion as to whether such a condition by necessity implies that a person would be unable to appreciate the nature and quality of his acts. The prosecutor asked a similar question of its psychiatric expert on direct examination. No question by the prosecutor asked the witness to opine whether Thigpen was able to appreciate his actions.

■ Expert testimony concerning the nature of a defendant's mental disease or defect, including its typical effect on a person's mental state is admissible. *United States v. Davis*, 835 F.2d 274, 276 (11th Cir.), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988). In *Davis*, the defendant, who attempted to establish an insanity defense based on a multiple personality disorder, objected to the testimony of a government expert that such a disorder does not in itself indicate that a person does not understand what he is doing. 835 F.2d at 276. We upheld the admission of this testimony since it "did not include an opinion as to *Davis'* capacity to conform his conduct to the law at the time of the robbery." *Id.* (emphasis added). Similarly, the testimony elicited by the government in Thigpen's case concerned the general effect of a schizophrenic disorder on a person's ability to appreciate the nature or wrongfulness of his actions.

In *United States v. Manley*, 893 F.2d 1221, 1224 (11th Cir.) (per curiam), *cert. denied*, 498 U.S. 901, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990), we upheld the exclusion of opinion testimony by a defense expert where counsel inquired as to the mental capacity of a hypothetical person with each of the pertinent characteristics of the defendant. While "a thinly veiled hypothetical" may not be used to circumvent Rule 704(b), the rule does not bar "an explanation of the disease and its typical effect on a person's mental state." *Manley*, 893 F.2d at 1224 (citing *Davis*, 835

F.2d at 276). The government's questions in Thigpen's case sought the latter and were therefore allowed without error.

## IV. CONCLUSION

When a defendant raises the defense of insanity, the function of the jury is to determine, based solely on the evidence introduced at trial, whether the defendant is guilty, not guilty, or not guilty by reason of insanity. The consequences of the verdict dictated by the evidence are not properly considered by the jury and are therefore not an appropriate subject for instruction. Only where the jury's attention has been improperly drawn to the consequences of an acquittal by reason of insanity should the jury be charged, upon contemporaneous objection and request, as to the actual ramifications of such a verdict. We AFFIRM the convictions of Barnett and Thigpen.

COX, Circuit Judge, concurring in part and dissenting in part, in which KRAVITCH, Circuit Judge, joins.

Today's decision counsels trial judges not to tell jurors the truth about the consequences of a not guilty by reason of insanity verdict—apparently on the theory that jurors should not be concerned about the consequences. As a matter of fact, however, jurors are concerned about the consequences. The majority opinion will simply perpetuate jurors' uncertainty about this relatively new type of verdict in the federal system. Jurors will know that a conviction probably will send a dangerous defendant to prison. They will not know that an acquittal only by reason of insanity would lead to the defendant's confinement and treatment in a mental institution until the defendant is no longer a danger to others. Thus, fears about the possible release of a dangerous defendant can only prompt jurors to find the defendant guilty. I respectfully dissent.[1]

## I. BACKGROUND

A close look at the facts of the present cases shows how the rule adopted by the

---

1. I concur in the majority's disposition of the issues on these appeals except for the jury instruction issues.

majority can skew the chances of a defendant who relies on an insanity defense.

William James Thigpen purchased three semi-automatic pistols from various firearms dealers in January 1990. In order to buy the firearms, Thigpen had to falsify three separate Bureau of Alcohol, Tobacco and Firearms applications by indicating that he had never been convicted of a crime punishable by a term of imprisonment exceeding one year. Soon after purchasing the guns, Thigpen was taken from his home, an adult congregate living facility for the mentally disturbed, to a nearby medical center. Upon arriving, he told the intake nurse that he was hearing voices that were telling him that people were trying to hurt him. He also told the nurse that he had not taken his required anti-psychotic medication for the past three months. It was later discovered that Thigpen had brought one of the three illegally obtained guns with him to the medical center.

In September 1990, Thigpen was charged in a six-count indictment with federal firearms violations. Counts I, III and V charged him with making false statements concerning his criminal background when purchasing the three pistols, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(1). Counts II, IV and VI charged Thigpen with illegally possessing the three pistols after conviction of a felony, in violation of 18 U.S.C. § 922(g)(1).

Thigpen stipulated that he committed the acts giving rise to the charges against him, but he asserted an insanity defense. The sole issue for the jury was whether Thigpen was insane at the time of the offenses. Thus, jurors had only two viable verdicts to choose from: They either had to find Thigpen guilty, which they knew would subject him to possible incarceration, or they could find him innocent by reason of insanity, which they may or may not have known would subject him to commitment to a mental health facility.

Two psychiatrists testified in the case. Dr. Mohamed O. Saleh was called by Thigpen and Dr. Ernest Carl Miller was called by the Government. Each expressed the opinion that Thigpen was suffering from a schizophrenic disorder. Additionally, the testimony of each of these experts suggested that Thigpen's mental illness presented the risk of injury to others.

The jury also heard testimony that eleven other psychiatrists had diagnosed Thigpen as suffering from schizophrenia of an undifferentiated type. Thigpen resided at an adult congregate living facility, receiving social security disability benefits due to schizophrenia and mental retardation. In addition, on cross-examination the prosecutor brought out that Thigpen was currently loose, "out in the world, amongst society." (R.2 at 110.) The prosecutor followed this remark by commenting that when Thigpen is "released from the hospital, he's on society." (R.2 at 111.)

Prior to trial, Thigpen had requested a jury instruction explaining the consequences of a verdict of not guilty only by reason of insanity as set out by the Insanity Defense Reform Act of 1984. He offered to modify the instruction in any way suggested by the court. The court denied the request.

The jury found Thigpen guilty on all six counts. After the jury returned its verdict, the court determined that Thigpen was presently suffering from a mental disease or defect (specifically, chronic schizophrenia, undifferentiated type) and in need of care and treatment in a suitable facility pursuant to 18 U.S.C. § 4244. Thigpen was then sentenced to the custody of the Attorney General to be confined in a suitable facility for care and treatment for a period of time not to exceed the statutory maximum sentence for the offenses.

Insanity also was the only defense argued by Herman Campbell Barnett, Jr. Barnett had retired from the U.S. Army after twenty years of service that included three combat tours in Vietnam. Married and the father of two children, Barnett worked as a convenience store manager. He unsuccessfully attempted to buy his own convenience store in early 1989. The transaction fell through after a bank refused to extend credit to Barnett. Shortly thereafter Barnett embarked on a year-long series of armed bank robberies, during which he stole a total of almost $197,000. He was forty-four years old when

the robberies began; he had no prior criminal record.

Barnett confessed to the robberies upon his arrest. At his trial, he called as an expert witness a psychologist, Dr. Martin Youngleson, who testified that combat duty in Vietnam had left Barnett with a chronic and severe post-traumatic stress disorder. In the psychologist's opinion, Barnett was suffering from the disorder at the time he robbed the banks. Testimony by Youngleson and other defense witnesses included graphic details of some of Barnett's combat experiences. The Government countered Youngleson's diagnosis with testimony from a psychiatrist, Dr. Dave McCallister Davis. Davis testified that, in his opinion, Barnett did not suffer from post-traumatic stress disorder or any other psychiatric disorder.

Barnett asked the court to instruct jurors that if they found him not guilty by reason of insanity, he would be committed to a medical facility until he could prove that his release would not endanger others. The court refused to give the requested instruction, but told jurors that they were not to be concerned with the consequences of their verdict.

The jury found Barnett guilty on four counts of bank robbery, in violation of 18 U.S.C. § 2113(a), (d), and one count charging him with use of a firearm while committing a crime of violence, in violation of 18 U.S.C. § 924(c). The court sentenced Barnett to concurrent terms of ninety-eight months imprisonment on each robbery count, plus a consecutive term of sixty months imprisonment on the firearm count. Barnett was ordered to make restitution to the banks he had robbed. The court also recommended that Barnett receive a psychiatric evaluation and any appropriate psychiatric care.

In summary, the insanity defense was the only reasonable argument available to either Barnett or Thigpen at their respective trials. Each defendant presented evidence, including expert testimony, to support his defense. Jurors, however, were not told—and could not have been expected to know—that a successful insanity defense would lead to the defendant's commitment and treatment. The jurors did know that a verdict of guilty could lead to the defendant's imprisonment.

## II. DISCUSSION

Confusion among jurors over the current insanity defense should be expected. The defense has evolved greatly in recent years. Prior to 1984, a defendant who was acquitted by reason of insanity in a federal court was simply released.[2] This unfortunate situation was partially alleviated by the states, which would frequently institute state civil commitment proceedings against those federal defendants released pursuant to an insanity verdict. See *United States v. McCracken*, 488 F.2d 406, 416–17 (5th Cir.1974).[3]

In 1984 Congress passed the Insanity Defense Reform Act (the "Act"), 18 U.S.C. §§ 4241–4247. The Act expressly provides for a special verdict of not guilty only by reason of insanity. In addition, because the claim of insanity is now considered an affirmative defense, the defendant is required to prove insanity by offering clear and convincing evidence. Moreover, and most significant, a defendant who is acquitted only by reason of insanity is now committed to a suitable facility for care and treatment unless and until the court finds that his release will not create "a substantial risk of bodily injury to another person or serious damage of property of another." 18 U.S.C. § 4243(d).

Given the sweeping changes brought about by the Act in federal insanity jurisprudence, one can fairly presume that although some lawyers might be familiar with the consequences of an insanity verdict, the average juror is not so informed.

"The lack of a common understanding of the meaning of [an insanity verdict] cannot be attributed solely to limited legal education

---

**2.** Criminal cases arising in the District of Columbia were the exception. Federal courts there had a statutory scheme in place prior to 1984 that provided for commitment after an acquittal by reason of insanity.

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of the public in general and jurors in particular, since the legal meaning of the [insanity verdict] in fact varies not only from state to state, but from state to federal practice." *McCracken*, 488 F.2d at 421.

The likelihood of jury confusion led the D.C. Circuit Court of Appeals to mandate a jury instruction explaining the consequences of an insanity verdict pursuant to the statutory scheme governing the District of Columbia. *Lyles v. United States*, 254 F.2d 725 (D.C.Cir.1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), *and cert. denied*, 362 U.S. 943, 80 S.Ct. 809, 4 L.Ed.2d 771 (1960), *and cert. denied*, 368 U.S. 992, 82 S.Ct. 610, 7 L.Ed.2d 529 (1962). Commenting on juror confusion, the court noted that

> [j]urors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning.

*Id.* at 728. The court went on to hold that "the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." *Id.*

The old Fifth Circuit first wrestled with a similar instruction issue in *Pope v. United States*, 298 F.2d 507 (5th Cir.1962), *cert. denied*, 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965). There, the defendant requested a jury instruction explaining that he would be committed to a mental hospital should the jury find him not guilty by reason of insanity. The district court denied the request. On appeal, the Fifth Circuit held that the instruction was an incorrect statement of law (because this was a pre-Act case and there was no other statutory procedure for committing a defendant that was found not guilty by reason of insanity). With regard to the reasoning of the D.C. Circuit in *Lyles*, the Fifth Circuit simply held that *Lyles*'s reasoning was inapposite inasmuch as the D.C. Circuit *had a law on the books* at that time

which provided for mandatory commitment. *Id.* at 509.

The Fifth Circuit revisited the issue in *United States v. McCracken*, 488 F.2d 406 (5th Cir.1974). *McCracken* involved a defendant who killed a medical doctor at a hospital where the defendant was then residing. At trial, his only defense was insanity. The district court instructed the jury that if found not guilty by reason of insanity, McCracken would be turned "a loose" and "immediately released." *Id.* at 415. McCracken objected, arguing that such an instruction invited the jury to find him guilty in order to ensure his post-trial confinement, even if the jury believed he was insane.

The Fifth Circuit reversed, holding that *Lyles* was again inapposite to criminal proceedings in the Fifth Circuit since the Fifth Circuit did not have a comparable statute authorizing commitment to a suitable mental health facility. Because the jury instruction requested in *Pope* was an incorrect statement of the law, and the jury instruction in *McCracken* was in fact a correct statement of the law, the court in *McCracken* went on to decide that a jury instruction's correctness is unimportant in light of "the principle that [holds] it is error to instruct the jury on punishment." *Id.* at 425.

Because charging the jury on the correct state of the law in *McCracken* (defendant goes free) had absolutely no chance of leveling the playing field for the defendant (and in fact had the potential only to reinforce a juror's inclination to lock up an insane but innocent defendant), the Fifth Circuit found that the principle of shielding the jury from the issue of punishment outweighed the goal of enlightening the jury on the true state of the law. *See McCracken*, 488 F.2d at 424 (concluding that such an instruction could only induce a guilty verdict). Conversely, in the present cases, the absence of the instruction severely impaired the ability of Barnett and Thigpen to present their insanity defenses. The promulgation of the Act and the resulting turn in the law has shifted the balance in favor of instructing the jury that a defendant found insane is subject to involuntary confinement at a mental illness facility.

It is important to keep in mind that at the time *McCracken* was decided, a verdict of not guilty by reason of insanity was neither mandated nor authorized by statute. *McCracken* was based on the absence of a statutory scheme for committal: "Given the lack of any comparable statute applicable to other federal courts, it is obvious that the instruction on the consequences of [an insanity verdict] used in the D.C. Circuit would be inapposite outside the District of Columbia." *McCracken*, 488 F.2d at 422. And although the *McCracken* court also supported its holding by reasoning that the jury should not be made aware of possible punishments, it noted that the "crux of the problem with instructing a jury on punishment or disposition in a case such as the one *sub judice* [is] that it might under some circumstances induce a guilty verdict." *Id.* at 424. In the present case, no such problem exists. Instructing the jury on the consequences of an insanity verdict under these circumstances can only enhance the chances that a defendant, who was in fact insane at the time of his crime, will be found not guilty by reason of insanity.

We need not consider today whether an instruction on the consequences of a not guilty by reason of insanity verdict would always be appropriate if requested. The rule that the majority adopts, however, precludes the instruction even where its absence clearly cripples the defendant's insanity defense.[4] Such an instruction is not only appropriate but *necessary* when jurors hear evidence indicating that a defendant would pose a danger to society if released. This was the dilemma that confronted both Barnett and Thigpen.

Barnett presents a portrait of a seriously disturbed combat veteran. He brandished handguns to force bank employees to give him money. Not disputing these violent acts, he built his entire defense around evidence of a severe post-traumatic stress disorder dating to his experience in Vietnam. In Thig-

pen's appeal we see an obviously dangerous defendant. He hears voices that people are trying to kill him. He hears other voices that tell him to kill people. He has been diagnosed with the same mental illness for the past ten years, yet the jury was told that despite his condition he remains out amongst society. These circumstances could only cause jurors to be even more confused and fearful of the consequences of an acquittal.

The jurors knew that if they returned guilty verdicts, Barnett and Thigpen would be punished; if they found the defendants not guilty, Barnett and Thigpen would go free. The only option about which the jurors remained in the dark was also the only practical goal of the two men's defenses: not guilty by reason of insanity. Honoring the defendants' requests to instruct the jury would have ensured that jurors understood "the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." *Lyles*, 254 F.2d at 728. Furthermore, the jurors would not have been instructed on "possible punishments"; rather, they would have been told that Barnett and Thigpen were subject to long-term involuntary commitment at a suitable facility for care and treatment. This general information is comparable to what jurors knew about the other possible verdicts.

The majority opinion suggests that Barnett's and Thigpen's arguments undermine the principle that jurors are presumed to follow the court's instructions, citing the following instruction given the Thigpen jury:

> [T]he question of punishment should never be considered by the jury in any way in deciding the case. If the Defendant is convicted the matter of punishment is for the Judge to determine.

This reasoning rests on the erroneous assumption that jurors returning a verdict of not guilty only by reason of insanity would

---

4. The majority opinion permits courts to discuss "the actual ramifications" of an insanity verdict only if jurors have heard inadmissible evidence or improper questions or statements by prosecutors. That is, the majority believes that jurors should be given accurate information about an insanity verdict once their "attention has been improperly drawn to the consequences" of their verdict. My difference with the majority is with its unfounded assumption that jurors do not concern themselves with the results of their verdict unless a prosecutor first mentions the consequences.

think they had "convicted" a defendant. This instruction is clearly given for the benefit of the government—not the defendant. I fail to see how it helped Thigpen in any way. It told jurors that they should not be concerned about the consequences of a verdict of guilty, and that one of the consequences of such a verdict would be that the judge would decide what punishment was appropriate.

Also, notwithstanding language to the contrary in the majority opinion and in *McCracken*, telling jurors about the consequences of an acquittal on insanity grounds does not conflict with the principle that the question of punishment should be left to the court rather than the jury. Defendants who are found not guilty by reason of insanity are treated, not punished. Punishment awaits only those who are convicted.

## III.   CONCLUSION

Congress has now provided a procedure for dealing with defendants who are found not guilty by reason of insanity. They are subject to commitment at suitable facilities where their mental illness can be properly treated. This is the way it should be. Individuals who are found to have been insane at the time they committed crimes should not be held fully responsible for their actions.

"The wisdom, the justice, and the mercy reflected in [this] basic policy decision would be largely nullified if fears about mental illness are allowed to influence the decision on guilt or innocence." *McCracken,* 488 F.2d at 427.

When a court denies a defendant's request for an instruction, we review the decision to determine whether the denial seriously impaired the defendant's ability to present his defense. Given the facts *of these cases,* the courts' failure to charge the juries on the consequences of an insanity verdict had the effect of impairing the defendants' ability to assert their only feasible defenses.

The majority opinion forces an old rule of law onto a new type of verdict. The present cases illustrate how poor the fit is.