[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12462
Non-Argument Calendar
_____

D.C. Docket No. 2:13-cr-00016-LGW-JEG-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SCHELLA HOPE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(May 7, 2015)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Schella Hope appeals her numerous convictions for conspiracy to commit

health-care fraud, 18 U.S.C. § 1349; health-care fraud, 18 U.S.C. § 1347; aggravated identity theft, 18 U.S.C. § 1028A; money laundering, 18 U.S.C. § 1956(a)(1)(A)(i); and engaging in money-laundering transactions of over $10,000, 18 U.S.C. § 1957. Hope raises four challenges to her convictions, all of which we review for plain error. After careful consideration, we affirm.

## I.  General Background

The 59-count superseding indictment alleges that, beginning in January 2005 and continuing through 2011, Hope stole approximately $4 million from Medicaid by submitting thousands of phony claims for nutrition services that were not provided, not provided as billed, or not medically necessary, and that were not entitled to Medicaid reimbursement.

Hope was a licensed dietician who owned Hope Nutritional Services, LLC (HNS), which purported to provide nutrition services and counseling for children enrolled in Head Start through the state of Georgia. Head Start is a government-funded program that provides services to low-income children up to five years old, the majority of whom were recipients under the Georgia Medical Assistance Program (Medicaid). Medicaid covers certain nutritional counseling services ordered by a physician or provided by a licensed dietician.

In broad terms, the superseding indictment alleged the nature of the health-care fraud scheme as follows. Hope obtained a Medicaid provider number, hired

2

medical doctors with no background in treating children to serve as "medical directors" of HNS, and contracted with Head Start centers in order to obtain a list of children enrolled in the centers along with their Medicaid numbers. Using the Medicaid numbers, Hope submitted false claims to Medicaid for services that were not provided. To avoid detection, Hope and others created false documentation to reflect the purported services by, for instance, using "signature stamps" to make it look as if a doctor had prescribed the services. When the fraud began to be detected, she recruited a co-conspirator, Arlene Murrell, to, *inter alia*, continue to submit false claims under Murrell's Medicaid provider number. When Murrell received Medicaid reimbursement checks, she issued checks to HNS that corresponded to approximately 80% of the Medicaid checks' value. Hope also submitted false claims for nutrition services under the name of another licensed dietician, Marissa Garcia, without her permission.

We briefly review some of the evidence presented at Hope's five-day trial. In short, the evidence was consistent with the superseding indictment.[1] HNS employees traveled to Head Start centers throughout the state of Georgia to weigh and measure children and test their hemoglobin levels by pricking their fingers for blood. The HNS employees did not have any training for this work apart from taking an online course. At the Head Start centers, HNS employees received a list

---

[1] Hope does not challenge the sufficiency of the evidence to support her convictions.

3

of the children's Medicaid information for billing.   The Head Start director testified that Head Start was not supposed to give out children's Medicaid information.

At Hope's direction, HNS employees prepared "cookie-cutter" documentation concerning each child, including nearly identical prescriptions, nutritional assessments, nutritional counseling notes, and physician plans of care. The HNS employees who testified at trial indicated that they did not see Hope provide any nutritional counseling to children.   Nonetheless, Hope directed her employees to affix her signature to the records.   In addition, Hope directed HNS employees to use a doctor's signature stamp on patient forms, and employees also used blank prescriptions and plans of care, which were pre-signed by doctors without their authorization.

On follow-up visits to the Head Start centers, Tonya Hope, the defendant's sister-in-law, purportedly provided nutritional counseling.   At Hope's direction, Tonya falsely identified herself as a "nutritionist" by signing her name as such and occasionally wearing a lab coat.   Tonya was neither a nutritionist nor a registered dietician.   Tonya testified that she, and not Hope, provided the nutritional counseling, although the relevant patient forms were signed with Hope's signature. The government also presented evidence that Hope billed for services provided on days when she was on vacation.

4

Hope directed employees at HNS to file a certain number of Medicaid claims per day.  Early on, employees were supposed to bill only fifty patients per day.  Later, however, Hope sent an intraoffice memorandum telling employees to submit 100 claims per day.  Rocio Sloan, who was employed at HNS for approximately eight years, testified that Hope directed Sloan and others to submit claims to Medicaid, regularly held meetings about billing, and tracked the number of claims submitted to Medicaid each day.

Several parents and guardians of Head Start children testified.  They generally stated that they were not aware of any nutritional problems with their children, never took their children to a physician for a nutritional consultation, and did not fill out any forms regarding a nutritional assessment.

After Hope presented witnesses and testified in her defense, the jury deliberated for just over two hours and returned a verdict finding Hope guilty on all 58 counts remaining in the superseding indictment.[2]  She was sentenced to a total term of 192 months in prison.  Hope now appeals.

## II.  Standard of Review

Hope concedes that plain-error review applies to her arguments on appeal because she did not object to the alleged errors before the district court.  *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007).  To demonstrate plain

---

[2]  Before trial, on the government's motion, one count of engaging in money-laundering transactions (Count 55) was dismissed without prejudice.

5

error, a defendant must establish that there is "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are satisfied, we may exercise discretion to correct the error if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Madden*, 733 F.3d 1314, 1322 (11th Cir. 2013).

A "plain" error is one that is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1170, 1777 (1993); *see United States v. Lett*, 483 F.3d 782, 790 (11th Cir. 2007) (explaining that a "plain error" must be "plain under controlling precedent or in view of the unequivocally clear words of a statute or rule"). For an error to affect substantial rights, in most cases the error "must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734, 113 S. Ct. at 1777-78.

## III.  Discussion

Hope raises four issues on appeal. First, Hope argues, her aggravated identity-theft convictions must be reversed because health-care fraud is not a qualifying predicate felony for that offense. Second, she contends, the district court plainly erred by referencing punishment when instructing the jury on aggravated identify theft. Third, Hope challenges the government's presentation of "wealth evidence" during trial. And finally, she asserts, the prosecutor committed misconduct in closing arguments.

6

## A.    Aggravated Identity-theft Convictions

Hope first contends that she was wrongfully convicted of aggravated identity theft, in violation of 18 U.S.C. § 1028A, because health-care fraud is not an enumerated predicate felony under that statute.

When applying a criminal statute, we "generally must follow the plain and unambiguous meaning of the statutory language." *United States v. Albertini*, 472 U.S. 675, 680, 105 S. Ct. 2897, 2902 (1985).  Courts should interpret the words of a statute in context and avoid constructions that would render statutory language superfluous or inoperative.  *Hibbs v. Winn*, 542 U.S. 88, 101, 124 S. Ct. 2276, 2286 (2004).

Hope has not shown error, plain or otherwise.  Section 1028A provides for an additional two-year term of imprisonment when, "during and in relation to any felony violation enumerated in subsection (c)," a defendant "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."  18 U.S.C. § 1028A(a)(1).  A "felony violation enumerated in subsection (c)," in turn, means any offense that is a felony violation of, among others, "any provision contained in chapter 63 (relating to mail, bank, and wire fraud)."  18 U.S.C. § 1028A(c)(5).  Health-care fraud is prohibited in chapter 63 of Title 18. *See* 18 U.S.C. § 1347.  Thus, by the plain terms of the statute, health-care fraud is included within the ambit of predicate felonies described by § 1028A.  *See* 18

7

U.S.C. § 1028A(c)(5).

Hope contends that the appended parenthetical, "(relating to mail, bank, and wire fraud)," limits the scope of predicate chapter 63 offenses to *solely* "mail, bank, and wire fraud." We disagree.

In *United States v. Herring*, 602 F.2d 1220 (5th Cir. 1979),[3] this Court's predecessor rejected the same construction of 18 U.S.C. § 1961 that Hope seeks to apply to § 1028A. 602 F.2d at 1223. Section 1961 defines "racketeering activity" to include "sections 2314 and 2315 (relating to interstate transportation of stolen property)." *Id.*; *see* 18 U.S.C. § 1961. The defendant in *Herring* argued that his conviction under 18 U.S.C. § 2314, for interstate transportation of securities converted or taken by fraud, was not "racketeering activity" as defined by § 1961 because it did not involve "interstate transportation of stolen property," as identified in the parenthetical. *Herring*, 602 F.2d at 1223.

The Court in *Herring* rejected the defendant's contention, holding that "the reference to the interstate transportation of stolen property in the parenthetical . . . was intended merely to aid the identification of [the section] rather than to limit the proscriptions of that section." *Id.* The Court explained that the defendant's restrictive reading of the parenthetical would undermine the remedial purposes of the statute—to eradicate organized crime. *Id.* And, further,

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*), this Court adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

[i]f Congress had intended to exclude the interstate transportation of property obtained by fraud from its definition in section 1961, it specifically could have limited the incorporation of section 2314" as it did the incorporation of another section. *Id.*

Guided by *Herring*, we conclude that the reference to mail, bank, and wire fraud in the parenthetical after "any provision in chapter 63," 18 U.S.C. § 1028A(c)(5), serves only an explanatory or descriptive purpose and does not limit the scope of predicate felonies under chapter 63.[4]  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84, 112 S. Ct. 2031, 2037 (1992) (explaining that the ordinary meaning of the phrase "relating to" is a broad and expansive one).  A restrictive reading of § 1028A(c)(5) would "undermine the remedial purposes that Congress intended," which was to combat identity theft. *See Herring*, 602 F.2d at 1223.  And if Congress had intended to exclude health-care fraud from its definition of predicate felony violations, it expressly could have done so as it did in other parts of § 1028A.[5]  Furthermore, Hope's proposed

---

[4]  Section 1028A(c)'s list of enumerated felonies contains eleven subparts, each of which has a similar parenthetical providing a general description of the offenses to which they pertain. 18 U.S.C. § 1028A.  Some subparts refer to specific statutory sections, such as "section 911 (relating to false personation of citizenship)," 18 U.S.C. § 1028A(c)(3), while others refer to chapters, as in this case. *See United States v. Abdur-Rahman*, 708 F.3d 98, 101 (2d Cir. 2013) (providing a general description of these subparts).

[5]  For example, § 1028A(c) lists qualifying predicate felonies as including a felony violation of "any provision contained in this chapter (relating to fraud and false statements), *other than this section or [§] 1028(a)(7)*." *See* 18 U.S.C. § 1028A(c)(4) (emphasis added).

9

construction would render superfluous the language "any provision in Chapter 63" by equating it to "mail, bank, and wire fraud." *See Hibbs*, 542 U.S. at 101, 124 S. Ct. at 2286.

Accordingly, we conclude that Hope was properly convicted of aggravated identity theft based on the predicate felony of health-care fraud.[6]

B.    *Jury Instructions*

Hope next argues that the district court plainly erred by referring to issues of punishment when instructing the jury on the offense of aggravated identity theft. We disagree.

In general, "juries are not to be informed of or concerned with the consequences of their verdicts." *United States v. Thigpen*, 4 F.3d 1573, 1577 (11th Cir. 1993) (*en banc*).    Except in limited cases, the jury has no sentencing functioning, and matters of punishment should not be considered in arriving at a verdict as to guilt or innocence. *Id.* Informing jurors about the consequences of their verdicts tends to draw jurors' attention away from their sole role as judges of the facts and to open the door to compromise verdicts or confusion of the issues to be decided. *Id.* We have specifically stated that "[t]his court does not approve of

---

[6] We also note that our interpretation is consistent with other circuit courts' construction of the predicate felony definitions in § 1028A(c). *See, e.g.*, *Abdur-Rahman*, 708 F.3d at 101-02; *United States v. Harrell*, 637 F.3d 1008, 1010-12 (9th Cir. 2011); *United States v. Persichilli*, 608 F.3d 34, 40-41 (1st Cir. 2010).

informing a jury of a minimum or maximum punishment." *United States v. Cox*, 696 F.2d 1294, 1296 (11th Cir. 1983).

Here, when instructing the jury on the offense of aggravated identity theft, the district court began by stating, consistent with this Circuit's pattern jury instruction, "Now the law provides for an *enhanced penalty* when anyone commits aggravated identity theft during and in relation to other certain specified felony offenses." (emphasis added). Thus, the court made a passing reference to punishment that arguably violated the "canon that juries are not to be informed of or concerned with the consequences of their verdicts." *Thigpen*, 4 F.3d at 1577.

However, a reference to punishment in jury instructions alone does not necessarily constitute error. For example, in *Cox*, the judge gave the jury the following instruction: "the Judge, under the law, is permitted to impose anything from a term of probation or a fine up to the maximum term of imprisonment that Congress has set." 696 F.2d at 1298. Noting that this Court "prefers no reference to sentencing whatsoever," we nonetheless found that the instruction was not erroneous because it "in no way intimated what punishment [the judge] might be inclined to give," and the judge "consistently informed the jury that potential punishment was *not* their concern." *Id.* at 1298-99.

Similarly, in this case, the district court's passing reference to sentencing in no way intimated the likely consequences of finding Hope guilty. The court did

not state that a two-year term of imprisonment applies. *See* 18 U.S.C. § 1028A(a)(1). And a jury might reasonably infer that finding Hope guilty of any additional offense, particularly one with "aggravated" in its title, might result in an "enhanced penalty," whether instructed by the court to that effect or not. The reference to "enhanced" also serves to highlight that aggravated identity theft is a crime in addition to the predicate felony of health-care fraud.

And the district court expressly told the jury that punishment was not their concern. Later in its instructions, the court stated, "You must never consider punishment in any way to decide whether the Defendant is guilty. If you find the Defendant guilty, the punishment is for the Judge alone to decide later." Further, the court instructed, "Remember that, in a very real way, you're judges—judges of the facts. Your only interest is to seek the truth from the evidence in the case." We presume that juries follow the court's instructions. *Thigpen*, 4 F.3d at 1577. Therefore, in view of the court's express instructions not to consider punishment in any way and only "to seek the truth from the evidence in the case," Hope has not shown that mere reference to an "enhanced penalty" was erroneous. *See Cox*, 696 F.2d at 1298-99; *see also United States v. Cochran*, 683 F.3d 1314, 1319 (11th Cir. 2012) (we analyze the objected-to portion of the instruction in light of the entire charge, keeping in mind that apparently prejudicial isolated comments may be innocuous in context).

12

Nor do the circumstances indicate that the "enhanced penalty" instruction had any effect on the outcome of the case. *United States v. Prather*, 205 F.3d 1265, 1271 (11th Cir. 2000) (stating that reversal on plain error is only appropriate if the challenged instruction "was probably responsible for an incorrect verdict, leading to substantial injustice" (internal quotation marks omitted)). In short, the court did not err in giving the "enhanced penalty" instruction.

C.    *Admission of "Wealth Evidence"*

Hope next argues that the district court plainly erred in allowing the government to introduce evidence of her wealth, luxury purchases, vacation expenses, and automobile leases. She asserts that the admission of such "wealth evidence" constituted plain error because the evidence was irrelevant to the issues before the jury and biased the jury against her.

For instance, at trial, during its case in chief, the government elicited testimony from the case agent regarding a "rare elite type of corporate card" issued to HNS. He described various charges on the card, including numerous purchases of luxury items (with details of particular purchases and specific dollar amounts), stays at luxury resorts, and lease payments for "high-end" BMW automobiles. Another witness testified that she had reviewed HNS's financial records, which showed payments on boat loans, jewelry, and the BMW automobiles. Then, after Hope testified in her defense that the billing process had been a bureaucratic

13

nightmare, the prosecutor cross-examined Hope about numerous luxury purchases and whether these were part of her "nightmare." Specifically, the prosecutor referred to luxury purchases from high-end designers such as Chanel, Gucci, and Louis Vuitton. The prosecutor cited this evidence in closing arguments.

Whether evidence of wealth is properly admissible depends on the specific facts of the case. *See United States v. Nill*, 518 F.2d 793, 802 (5th Cir. 1975) ("A man's wealth is wholly irrelevant to his guilt or innocence in a criminal prosecution unless the wealth is directly connected to the offense for which he is standing trial."). On the one hand, "[u]se of a defendant's wealth to appeal to class bias can be highly improper and can deprive that defendant of a fair trial." *United Bradley*, 644 F.3d 1213, 1271 (11th Cir. 2011) (internal quotation marks omitted). But on the other, "evidence of wealth or extravagant spending may be admissible when relevant to issues in the case and where other evidence supports a finding of guilt." *Id.*

We have noted that it is often difficult to determine whether wealth evidence is "intended to appeal to class bias or to establish a fact in issue." *Id.* Therefore, a court's determination of whether wealth evidence is relevant under Rule 401, Fed. R. Evid., and whether the evidence's probative value is substantially outweighed by its unfair prejudice under Rule 403, Fed. R. Evid., must turn on the specific facts of the case. *Id.*; *see also United States v. Jackson-Randolph*, 282 F.3d 369,

14

378 (6th Cir. 2002) (delineating factors to analyze whether wealth evidence is unfairly prejudicial). Rule 403 is "an extraordinary remedy that should be used sparingly," and in reviewing Rule 403 issues "we look at the evidence in the light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Flanders*, 752 F.3d 1317, 1335 (11th Cir. 2014) (quotation marks omitted), *cert. denied*, (U.S. Jan. 26, 2015) (No. 14-7642).

Here, the admission of evidence regarding Hope's wealth and luxury purchases was not erroneous because it was relevant to the issues in the case, and other evidence supports Hope's guilt. *See Bradley*, 644 F.3d at 1271. Some of the evidence was relevant to establishing the fraudulent nature of specific claims. For example, evidence of Hope's expenditures while on vacation showed that Medicaid was billed for services on dates when Hope was not at HNS.

The wealth evidence was also relevant to rebutting Hope's defenses to the charges. As part of her defense, Hope contended that she used the $4 million to put into her practice and to pay her employees, who, according to her attorney's opening statement, "put that money in their bank account." Evidence of Hope's lavish personal spending during the period in which the offenses occurred supports the opposite inference—that the majority of the money was going directly to Hope for her personal benefit. Hope also argued that she did not knowingly commit

15

fraud, but rather that the overpayments were the result of billing errors. The wealth evidence was relevant to this defense because it supports an inference that Hope did not honestly believe that she was receiving payments from Medicaid as a result of billing errors or other mistakes, and also that she was the person responsible for the scheme.

The evidence also goes to Hope's motive to commit the offenses. Hope argues that motive was irrelevant by pointing to the prosecutor's statement to the jury that he did not "need to show you why somebody committed a crime." However, the fact that motive is not an element of the offense requiring proof does not mean that it is irrelevant. As we have stated, "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985); *see also* Fed. R. Evid. 404(b)(2) (noting that evidence of prior bad acts may be admissible for the purpose of proving motive).

In sum, the evidence of Hope's wealth and spending was relevant to facts at issue in Hope's trial. *See Bradley*, 644 F.3d at 1271-72. In addition, a substantial amount of other credible evidence of the illegal activity was presented. *See id.* at

1271. In view of these facts, we cannot say that the probative value of the wealth evidence was substantially outweighed by a danger of unfair prejudice. *See Flanders*, 752 F.3d at 1335. Therefore, the district court did not commit error, plain or otherwise, in admitting the evidence.

### D.    *Prosecutorial Misconduct*

Hope contends that the government's closing argument constituted prosecutorial misconduct because it included several unduly inflammatory statements and an improper "Golden Rule" argument.

The sole purpose of closing argument is to assist the jury in analyzing the evidence presented at trial. *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997). To establish prosecutorial misconduct in closing argument, the defendant must show that the prosecutor's remarks were (1) improper and (2) prejudicially affected her substantial rights. *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). We first explain the comments Hope challenges on appeal, then address whether they were improper, and finally proceed to the question of prejudice.

#### 1.    The prosecutor's comments

Hope points to the following four allegedly improper comments by the prosecutor: first, in discussing the data regarding the large number of claims Hope submitted to Medicaid for services, the prosecutor stated, "Are you kidding me

17

with this?  Really?  7,000 kids?  7,000 kids in one month.  You all can do the math. That's like 225 kids a day.  940 kids on September 11th of 2006.  It makes me sick to think that September 11th, I'm going to remember it for this (indicating)."

Second, in reference to testimony that untrained HNS employees pricked the fingers of Head Start children purportedly to obtain hemoglobin measurements, the prosecutor stated,

> What was truly horrifying to me -- and I don't know if you caught this -- but you've got some folks that are up there testifying about how they're pricking the fingers of these children -- no training, nothing. They're stabbing these little kids.
>
> How would you feel, ladies and gentlemen, if you sent your kid to some center and have some stranger, high school educated person, that's going bing and stabbing your kid with a pin?  I don't think you'd be too happy.

Third, the prosecutor commented on Marissa Garcia, an HNS employee who testified at trial, as follows:  "And you heard Marissa Garcia. Marissa Garcia is probably one of the funniest witnesses that I've seen in quite a long time. She got up there, and she was honest."

Finally, in rebuttal closing argument, the prosecutor stated,

> Ladies and gentlemen, counsel quotes for you a Biblical verse.  Let me quote for you from the Old Testament, one other thing I'd like you to think about when you go back there, one of the Ten Commandments.  You might have heard of it. "Thou shalt not steal." That's what this case has been about.

2.      Whether the comments were improper

Improper suggestions, insinuations, or assertions that are calculated to produce a wrongful conviction by misleading the jury or appealing to the jury's passion or prejudice are forbidden in closing arguments.  *United States v. Rodriguez*, 765 F.2d 1546, 1559-60 (11th Cir. 1985).  However, "there is no prohibition on colorful and perhaps flamboyant remarks if they relate to the evidence adduced at trial."  *Bailey*, 123 F.3d at 1400 (internal quotation marks omitted).

Remarks can also be improper "if they attempt to bolster the credibility of a witness based on the government's reputation or through alluding to evidence not admitted at trial."  *Lopez*, 590 F.3d at 1256.  Improper bolstering occurs if the "jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility."  *Id.* (quotation marks omitted).  However, this prohibition does not forbid prosecutors from arguing credibility based on evidence admitted at trial.  *Id.*; *see United States v. Schmitz*, 634 F.3d 1247, 1270 (11th Cir. 2011) ("We have no doubt that there are some cases where a prosecutor is justified in arguing during closing arguments that a particular witness is lying, if that is an inference supported by the evidence at trial.").

We agree with Hope that the prosecutor's closing arguments contained some clearly improper statements.  First, the prosecutor's reference to September 11

19

was, in context, improper and appears calculated solely to appeal to the jury's passion or prejudice. While the reference to the number of claims HNS submitted on September 11, 2006, in and of itself, was based on the evidence presented, the prosecutor went further. In stating that "it "makes [him] sick" to think that he'll remember September 11 for Hope's Medicaid fraud, the prosecutor implied that the juries should also be disgusted not solely by the evidence of Hope's actions but rather by some specious connection to an emotionally charged event. Therefore, the remark was improper because it was intended solely to inflame.

Second, the prosecutor made an improper appeal to the jurors' emotions by asking the jurors to place themselves in the position of parents whose children were "stabb[ed] with a pin" by HNS employees without medical backgrounds or training. *See United States v. McGarity*, 669 F.3d 1218, 1246 (11th Cir. 2012); *cf. Grossman v. McDonough*, 466 F.3d 1325, 1348 (11th Cir. 2006) (habeas case discussing improper "Golden Rule" arguments under Florida law). Alone, the prosecutor's simple use of the word "stab" as opposed to "prick" would not have been improper because it related to evidence admitted at trial and emphasized the government's position that the services HNS provided to Head Start children were fraudulent. But, in context, the remarks—particularly the invitation to the jurors to put themselves in the positions of the children's parents—plainly were an improper appeal to the jurors' emotions.

20

We do not find that the other remarks challenged by Hope were improper. With respect to the statement that Garcia was "honest," the prosecutor did not improperly vouch for a witness's credibility. After stating that Garcia was honest, the prosecutor went on to discuss her testimony and the other evidence introduced at trial. Therefore, in context, we understand the prosecutor's "honest" remark to be an argument in favor of finding Garcia credible based on her behavior on the stand and the evidence admitted. *See Lopez*, 590 F.3d at 1256.

Finally, the prosecutor's reference to the Ten Commandments' prohibition against stealing was made in response to Hope's counsel's reference to a Biblical passage. We have explained that "[a] prosecutor is entitled to make a fair response to defense counsel's arguments," even if the statement would otherwise be inadmissible. *United States v. Frank*, 599 F.3d 1221, 1238 (11th Cir. 2010). In any case, the prosecutor did not ask the jury to decide the case on a religious or emotional basis, and the remark served mainly to highlight the government's position that the case was fundamentally about theft. *See Bailey*, 123 F.3d at 1400-01 (holding that two references to the Bible during closing argument were not improper).

3.    Whether Hope has shown prejudice to her substantial rights

Improper remarks alone will not entitle a defendant to relief. Rather, Hope must show prejudice to her substantial rights. In other words, Hope must

21

demonstrate a reasonable probability that, but for the improper remarks, the result of the trial would have been different. *Lopez*, 590 F.3d at 1256. She has not done so for several reasons. *See id.* (delineating factors to assess the prejudicial effect of a prosecutor's conduct). We consider whether a defendant's substantial rights were prejudiced "in the context of the entire trial, along with any curative instruction." *Id.*

First, the improper remarks were isolated. They were not interrelated or an extension of impermissible comments earlier in the proceeding. *See, e.g.*, *Schmitz*, 634 F.3d at 1270 (finding that comments in closing argument were improper because "they were a clear continuation" of improper questions during cross-examination).

Second, the district court gave curative instructions. *See Lopez*, 590 F.3d at 1256 (stating that, where the district court takes proper curative measures, "we will reverse only if the evidence is so prejudicial as to be incurable by that measure."). The court instructed the jurors that their decisions "must be based only on the evidence presented here in this courtroom, that "anything the lawyers say is not evidence," and that they "must not be influenced in any way by either sympathy for or prejudice against the Defendant or the Government."

Third, and most significantly, the government convincingly established Hope's guilt by admissible, inculpatory evidence, the vast majority of which is

uncontested by Hope on appeal and unrelated to the errors raised. *See id.* ("When the record contains sufficient independent evidence of guilt, any error is harmless." (quotation omitted)). At trial, the government presented extensive documentary and testimonial evidence of guilt from fraud investigators, the case agent, numerous former HNS employees, Hope's cooperating co-conspirator, and the parents of Head Start children whose billing information was used by Hope. Hope does not argue that the evidence of her guilt was weak or insubstantial. In addition, Hope testified on her own behalf. By doing so, she ran the risk that the jury would disbelieve her and conclude that the opposite of her testimony was true. *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995). For the foregoing reasons, Hope has not met her burden of showing that the prosecutor's improper comments prejudicially affected her substantial rights. *See Lopez*, 590 F.3d at 1256-58; *McGarity*, 669 F.3d at 1246-47.

This fact, however, does not excuse the prosecutor's clearly improper remarks, and we pause to remind the prosecutor of his special obligations in our adversary system:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence

23

> suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

### E.    Cumulative Error

Finally, Hope asserts that, in light of all the alleged errors at trial, we should reverse her convictions pursuant to the cumulative-error doctrine because she was denied a fundamentally fair trial.

Under the cumulative-error doctrine, we will reverse a conviction "if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless." *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005). In making this determination, we consider, among other things, the nature and number of the errors, any interrelationship of the errors, and the strength of the government's case. *Id.* at 1223-24.

Having already determined that the district court did not err in applying 18 U.S.C. § 1028A, referencing punishment in the jury instructions, or admitting evidence of Hope's wealth and spending, we also conclude, from our review of the trial as a whole, that Hope was not denied a fair trial.

## IV.  Conclusion

For all of the reasons discussed above, we affirm Hope's convictions.

24

**AFFIRMED.**