[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10339

_____

D.C. Docket No. 1:12-cr-20953-JIC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KORRIGAN BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 4, 2015)

Before CARNES, Chief Judge, MARTIN, Circuit Judge, and THAPAR, District
Judge.[*]

_____

[*] Honorable Amul R. Thapar, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

PER CURIAM:

After a five-day trial at which he presented a defense of not guilty by reason of insanity, Korrigan Brown was convicted of conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, and using a firearm during a crime of violence.  He challenges his convictions and his sentence.

I.

On December 14, 2012, Brown called his childhood friend Lamel Lattimore and asked him to come over to his house.  At Brown's house Lattimore agreed to drive the car while they committed a robbery.  They drove to another friend's house, and Brown borrowed a firearm from him and put it in a backpack.  Brown and Lattimore met up with Nathan Holmes, who had committed armed robberies with Brown "more than three times" before.  Holmes agreed to participate in a robbery that day, went into his house and retrieved his firearm, and left in the car with Lattimore and Brown.

They drove to a Chevron station in Miami Beach, but their armed robbery attempt ended unsuccessfully when an employee summoned the police, causing them to flee without any money.  The Chevron robbery was recorded on surveillance video.

2

Because that robbery attempt was unsuccessful, the three men tried again at a Wendy's restaurant in Hialeah. Lattimore parked the car at Wendy's, and Brown and Holmes got out with their firearms and the backpack. After they entered Wendy's, Brown pointed his firearm at the cashier and told him to open the cash registers. The cashier handed Brown the money from the registers, which he put in his backpack. Brown and Holmes ran out of the restaurant. That robbery was also recorded on surveillance video.

As the three men pulled away in Lattimore's car, a witness called 911 and reported that the Wendy's had just been robbed and the robbers were fleeing in a gray car. Responding to the 911 call, Officer Orlando Salvat began following Lattimore's car and eventually stopped it. The dispatcher confirmed, based on information from the 911 caller who was watching the events unfold, that it was the car with the Wendy's robbers in it. Based on that information, Salvat drew his gun and ordered everyone in the car to get out and put their hands on the roof of the car. Lattimore and Holmes complied. Brown exited the car and fled, carrying the backpack. Salvat and another officer who had arrived at the scene fired shots at Brown but missed. Brown kept running. He was eventually apprehended by officers using a K-9 and tasers.

In the truck where Brown had been hiding, there was a backpack, a pair of gloves, and a cell phone. The cell phone's call records later showed that it had

3

been used to make a call to Lattimore on the morning of the robberies and to make calls while it was being transported toward the Chevron just before that first robbery. A t-shirt with a bloodstain was later found in Lattimore's car; the DNA in the blood matched Brown's.

A superseding indictment charged Brown, Lattimore, and Holmes with conspiracy to commit Hobbs Act robbery (Count 1) as well as the Hobbs Act robberies of the Chevron (Count 2) and the Wendy's (Count 4), all in violation of 18 U.S.C. 1951(a),[1] and use of a firearm during a crime of violence (Counts 3 & 5), in violation of 18 U.S.C. § 924(c)(1)(A). Brown pleaded not guilty and provided notice under Fed. R. Crim. P. 12.2, stating that he intended to rely on an insanity defense at trial. Lattimore and Holmes pleaded guilty and later testified at Brown's trial.

---

[1] Hobbs Act robbery includes an "attempt," which encompasses a robbery in which the robber fails to get anything of value, as in the Chevron robbery. The statute provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a) (emphasis added).

4

Brown's trial lasted five days. Defense counsel admitted during voir dire and in his opening statement that Brown had participated in the robberies, but he asserted that Brown was insane. Despite counsel's admission, the parties did not stipulate to all of the elements of Hobbs Act robbery. They did stipulate that the Chevron and Wendy's were businesses operating in foreign commerce and that the robbery of them had "obstructed, delayed and affected interstate and foreign commerce." See 18 U.S.C. § 1951(b)(3) (defining "commerce" as used in the statute as interstate or foreign commerce).

The government called ten witnesses: employees from the Chevron station and the Wendy's, officer Salvat and the K-9 officer, a police ID technician, a criminologist, an FBI agent, a cell phone records custodian, and Brown's co-conspirators Lattimore and Holmes. Defense counsel cross-examined the government's witnesses. Most of his questions were related to mental illness and the insanity defense, but not all of them. Some of them were about factual matters such as: why Officer Salvat decided to stop the defendants' car even though it did not match the description given by dispatch (a Honda, not a Nissan; gray, not "dark"); whether any firearm, clothing, or "masking equipment" was found in the police-marked perimeter where Brown had fled after the car was stopped; and whether the cell phone data revealed who possessed the cell phone that was alleged to be Brown's at the time of the robberies. Defense counsel also attempted to

5

establish through cross-examination that the firearm Brown was carrying was not loaded.

Brown moved for a judgment of acquittal at the close of the government's case, asserting that it had failed to prove its case. After that motion was denied, Brown called six witnesses in an attempt to establish his insanity defense: his stepfather, his mother, his friend, the mother of that friend, and two mental health experts. Both of the experts testified that they had diagnosed Brown with bipolar disorder. The government presented a mental health expert who testified that Brown was malingering and had shown no signs of bipolar disorder.

In his closing argument, defense counsel once again admitted that Brown had participated in the robberies, said that the only issue was whether he was insane at the time the crimes were committed, and argued that clear and convincing evidence established Brown's insanity. For each of the five counts, the verdict form contained three options: guilty, not guilty, and not guilty by reason of insanity. The jury found Brown guilty on all counts. It also specifically found that Brown used or carried a firearm in relation to the robberies, that he possessed it in furtherance of the crimes, and that he had brandished it.

Brown was subject to mandatory minimum consecutive sentences on the firearms convictions. The district court imposed a total sentence of 435 months imprisonment. This is Brown's appeal.

6

## II.

Brown contends that the district court erred in rejecting his proposed jury instructions about the burden of proof on the insanity defense and about the mandatory minimum punishment he faced if convicted. "We review a district court's refusal to give a requested jury instruction for abuse of discretion." United States v. Martinelli, 454 F.3d 1300, 1309 (11th Cir. 2006) (quotation marks omitted). "A district court's refusal to give a requested instruction is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." Id.

## A.

Brown acknowledges that the Insanity Defense Reform Act of 1984 establishes that insanity is an affirmative defense and that a defendant has the burden of proving it by clear and convincing evidence. See 18 U.S.C. § 17. That statute, titled "Insanity Defense," provides:

> (a)    Affirmative defense. — It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

7

(b)    Burden of proof. — The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Id.

The district court gave the Eleventh Circuit Pattern Jury Instruction on the insanity defense, which basically tracks the statute.  See 11th Cir. PJI – Criminal 15 (2010).  The district court instructed the jury as follows:

Now, there is an issue about the Defendant's sanity when the charged offense occurred. If you find beyond a reasonable doubt that the Defendant committed the offense, you must consider whether the Defendant was "not guilty only by reason of insanity."

A defendant is "insane" only if the defendant is unable because of severe mental disease or defect to appreciate the nature and quality or wrongfulness of an act. But mental disease or defect does not otherwise constitute a defense.

On the issue of insanity, it is the Defendant who must prove his insanity by clear and convincing evidence. Clear and convincing evidence is evidence sufficient to persuade you that the Defendant's claim is highly probable. It is a higher standard of proof than a preponderance of the evidence, but less exacting than proof beyond a reasonable doubt.

A "preponderance of the evidence" is enough evidence to persuade you that the Defendant's claim is more likely true than not true.

If the defendant proves insanity by clear and convincing evidence, then you must find the Defendant not guilty only by reason of insanity.

So there are three possible verdicts: Guilty, not guilty, and not guilty only by reason of insanity.

8

The proposed instruction that Brown submitted to the district court, which the court rejected, was:  "On the issue of insanity, the Defendant must be proven sane at the time of the charged offense beyond a reasonable doubt, as previously defined in these instructions."  Brown argues that after he produced "some evidence" to support his insanity defense, the government should have had the burden of proving beyond a reasonable doubt that he was not insane when he committed the crimes.  He argues that shifting the burden to him after he had produced some evidence of his insanity was a due process violation because the government was relieved of having to prove every element of the charged offenses.

Brown's proposed jury instruction would have put the insanity burden of proof on the government, which is contrary to the plain language of 18 U.S.C. § 17.  In effect, the instruction would have made sanity an element of the charged offenses.  Put another way, the instruction he wanted was:  The government must prove beyond a reasonable doubt that Brown was sane at the time he committed the charged offenses because Brown has presented some evidence that he suffered from mental illness.

This Court has already held that putting the burden of proof on the defendant to prove insanity by clear and convincing evidence, as 18 U.S.C. § 17 does, is constitutionally permissible.  United States v. Freeman, 804 F.2d 1574, 1576 (11th Cir. 1986).  The plain language of § 17 and the Freeman decision foreclose

9

Brown's arguments about the jury instructions he requested. The jury instructions that the court gave did not relieve the government of its burden of proving every element of the charged crimes (except to the extent of Brown's stipulation about interstate or foreign commerce). The district court did not err by refusing to give Brown's requested instruction on the burden of proof.

B.

Brown also contends that the district court erred by refusing to give another instruction he requested, which stated as follows:

> You must never consider punishment in any way to decide whether the Defendant is guilty. If you find the Defendant guilty, the punishment, <u>aside from any mandatory minimum</u>, is for the Judge alone to decide later.

> If you find the Defendant not guilty only by reason of insanity at the time of the offenses charged, <u>he will be committed to a suitable facility until such time as he is eligible for release</u>.

(Emphasis added.) The district court rejected that proposed instruction as an incorrect statement of the law and instead instructed the jury: "You must never consider punishment in any way to decide whether the Defendant is guilty. If you find the Defendant guilty, the punishment is for the judge alone to decide later."

Except in certain narrow circumstances, a jury should not be instructed on the consequences of finding a defendant not guilty by reason of insanity. <u>See</u> <u>United States v. Thigpen</u>, 4 F.3d 1573, 1575 (11th Cir. 1993) (en banc) (holding

10

that a defendant is not entitled to an instruction informing the jury of the commitment procedure in the Insanity Defense Reform Act "unless necessary to cure an erroneous view of the consequences of a not guilty by reason of insanity verdict due to inadmissible evidence or improper argument at the defendant's trial"); see also Shannon v. United States, 512 U.S. 573, 575, 114 S. Ct. 2419, 2422 (1994) (holding that a district court is not "required to instruct the jury regarding the consequences to the defendant of a verdict of 'not guilty by reason of insanity,' either under the Insanity Defense Reform Act of 1984 or as a matter of general federal practice").  Nor should a jury be instructed about a mandatory minimum sentence.  Shannon, 512 U.S. at 586-87, 114 S. Ct. at 2248 ("[A]s a general matter, jurors are not informed of mandatory minimum or maximum sentences, nor are they instructed regarding probation, parole, or the sentencing range accompanying a lesser included offense."); Thigpen, 4 F.3d at 1577 ("[T]he punishment provided by law for offenses charged is a matter exclusively for the court and should not be considered by the jury in arriving at a verdict as to guilt or innocence.") (quotation marks omitted).

Brown argues that he falls within an exception to those general rules — an exception the Supreme Court mentioned in dicta in its Shannon opinion.  The Court observed that, although district courts are generally not required to give an instruction about the confinement that awaits a defendant found not guilty by

11

reason of insanity, there could be circumstances in which some kind of instruction about it might be necessary.  The Court stated:

> If, for example, a witness or prosecutor states in the presence of the jury that a particular defendant would "go free" if found NGI, it may be necessary for the district court to intervene with an instruction to counter such a misstatement. The appropriate response, of course, will vary as is necessary to remedy the specific misstatement or error. We note this possibility merely so that our decision will not be misunderstood as an absolute prohibition on instructing the jury with regard to the consequences of an NGI verdict.

512 U.S. at 587–88, 114 S. Ct at 2428.

Brown contends that certain testimony that was given by a mental health expert at his trial made necessary his proposed instruction about the consequences of the jury's verdict and that the district court abused its discretion by not giving it. Brown's own mental health expert, Dr. Holmes, was testifying on cross-examination about a psychological test (Millon Clinical Multitaxial Inventory) that is used to determine if a defendant is "malingering or faking."  She testified that the Millon test, which she gave to Brown, "has built-in validity skills to tell if somebody is faking good or faking bad, in laymen's terms."  Then she explained what that meant, and in the course of that explanation she mentioned "a downward departure":

> <u>Faking bad is you are faking in criminal court for a downward departure, for insanity</u>, and you check off every mental illness there is, which would then spike you on the part that says you are faking bad.

12

(Emphasis added.)

Later, after Dr. Holmes had finished testifying, the government's expert Dr. Bugias was testifying on direct examination when he mentioned a "downward departure from the sentencing guidelines":

> Q. What is forensic psychology?
>
> A. Applying psychology to a legal question.
>
> As I mentioned earlier, the more frequent questions that the Court asks are whether somebody is competent to stand trial, and probably secondary, whether somebody is insane at the time of the offense, and to a lesser degree, infrequently, other questions of competency for Miranda rights, competency for self representation, pro se, risk assessment.
>
> <u>In State Court those are mitigating circumstances, those things that would allow for departure down from the sentencing guidelines.</u> Those are some of the issues.

(Emphasis added.)  On cross-examination, Dr. Buigas testified as follows:

> Q. You agree with me -- you made the comment earlier "downward departure from the sentencing guidelines." Do you recall that?
>
> A. Yes.
>
> Q. What that means in federal criminal court if somebody is convicted, Judge Cohn or any U.S. District Judge, under appropriate circumstances, can downward depart from a recommended –

The government objected to that line of questioning, and the court sustained the objection on relevance grounds.

13

This case does not fit within the Shannon opinion's dicta. Neither Dr. Holmes nor Dr. Buigas stated or implied that if found not guilty by reason of insanity Brown would "go free," Shannon, 512 U.S. at 587–88, 114 S. Ct at 2428. As a result, the district court did not abuse its discretion in declining to give Brown's requested jury instruction about the confinement or punishment consequences of its verdict.  See, e.g., Pope v. United States, 298 F.2d 507, 508 (5th Cir. 1962) ("To inform the jury that the court may impose minimum or maximum sentence, will or will not grant probation, when a defendant will be eligible for a parole, or other matters relating to disposition of the defendant, tend to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.").[2]

### III.

Brown next contends that the district court erred by limiting his cross-examination of the government's mental health expert, Dr. Buigas, on the subjects of punishment and prison medical records.  We review only for an abuse of discretion whether the district court erred in limiting the scope of a defendant's

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

14

cross-examination. United States v. Khan, 794 F.3d 1288, 1301 (11th Cir. 2015).

Even though the Confrontation Clause safeguards confrontation rights, "[d]istrict

courts retain wide latitude to impose reasonable limits on cross-examination based

on concerns about, among other things, harassment, prejudice, confusion of the

issues, the witness' safety, or interrogation that is repetitive or only marginally

relevant." Id. (ellipses and quotation marks omitted). "We review a preserved

Confrontation Clause claim de novo and also review de novo the question of

whether hearsay statements are testimonial for purposes of the Confrontation

Clause." United States v. Wilson, 788 F.3d 1298, 1316 (11th Cir. 2015) (citation

and quotation marks omitted).

## A.

The district court did limit defense counsel's cross-examination of Dr.

Buigas about his passing reference to "a downward departure from the sentencing

guidelines." The court ruled that cross-examination on that subject was irrelevant.

"[A] defendant can only cross-examine a prosecution witness if the information

sought to be elicited is relevant." United States v. Maxwell, 579 F.3d 1282, 1296

(11th Cir. 2009) (alteration and quotation marks omitted). "And the district court

enjoys wide latitude to impose reasonable limits on cross-examination based on,

among other things, confusion of the issues and interrogation that is repetitive or only marginally relevant." Id. (quotation marks omitted).

As we have already explained, it is well established that a jury should not consider the sentencing consequences of its verdict. See Rogers v. United States, 422 U.S. 35, 40, 95 S. Ct. 2091, 2095 (1975) (stating that a jury has "no sentencing function and should reach its verdict without regard to what sentence might be imposed"); United States v. Del Toro, 426 F.2d 181, 184 (5th Cir. 1970) ("The jury is to find guilt or innocence on the basis of the legal standards set out in the Judge's charge, and the consequence in terms of punishment is a matter for Congress on mandatory sentences or for the Court within limits fixed by the statute."). There was no implication in the testimony of any witness that Brown would "go free" if the jury found him not guilty by reason of insanity. Under the circumstances, the district court did not abuse its discretion by preventing Brown from cross-examining Dr. Buigas about the punishment Brown faced if convicted.

B.

Brown also contends that his Sixth Amendment rights were violated when Dr. Buigas testified that Brown's prison medical records indicated that during his interviews with the prison psychologist or medical staff he had not mentioned that

16

he suffered from mental illness.[3]  "We review a preserved Confrontation Clause claim de novo and also review de novo the question of whether hearsay statements are testimonial for purposes of the Confrontation Clause."  United States v. Wilson, 788 F.3d 1298, 1316 (11th Cir. 2015) (citation and quotation marks omitted).

Dr. Buigas testified on direct examination that he had reviewed Brown's Bureau of Prisons file in the course of assessing Brown's mental health.  He explained that all inmates are given a "psychological intake form" and undergo screening when they come into the prison.  Defense counsel objected, asserting that Dr. Buigas' "continuing narrative" was not relevant, and the court sustained that objection.  Then the following exchange occurred:

BY MS. PERWIN [AUSA]:

Q. When the Defendant was interviewed, was it close to when he arrived at FDC back in December?

A. It was.

Q. Did he report any mental illness?

MR. HOULIHAN: Objection, under Crawford.

---

[3] Brown asserts in passing a Fifth Amendment challenge, but he did not object on that ground in the district court, and he does not flesh out the argument in his briefs to this Court. As a result, it is abandoned.  See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014).

MS. PERWIN: This forms part of the records reviewed by this witness.

THE COURT: Overruled.

THE WITNESS: Yes, he was seen by a staff psychologist.

BY MS. PERWIN:

Q. Did he report mental illness?

A. He denied a history of mental illness.

Q. Did he report any hallucinations?

A. He denied auditory and visual hallucinations.

Q. Did he report having grandiose delusions or beliefs?

A. He said delusions were not elicited, no.

Brown's statements were not testimonial because they were made to medical and administrative personnel as part of a routine prison intake process and were not made for the purpose of being used later at trial.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309, 129 S. Ct. 2527, 2531 (2009) (stating that the Confrontation Clause "guarantees a defendant's right to confront those who bear testimony against him") (quotation marks omitted); Crawford v. Washington, 541 U.S. 36, 51–52, 124 S. Ct. 1354, 1364 (2004) (describing categories of testimonial statements).  We have explained that "[t]estimonial statements include statements that are the functional equivalent of in-court testimony, such as affidavits,

18

depositions, prior testimony and statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." United States v. Curbelo, 726 F.3d 1260, 1272 (11th Cir. 2013) (quotation marks omitted). Brown's prison medical records do not fit into that category of statements. Furthermore, before Dr. Buigas testified, Brown's own expert Dr. Holmes testified that none of Brown's prior medical or educational records referred to any mental illness. Brown's confrontation rights were not violated by the admission of Dr. Buigas' testimony about Brown's prison medical records.

## IV.

Brown also contends that the district court plainly erred by not calling on him to give a rebuttal closing argument, and also by not finding and correcting prosecutorial misconduct during the government's closing argument.

## A.

Brown contends that the district court violated procedural, fair trial, and due process requirements because it did not give him a rebuttal closing argument. He argues that he bore the burden of the sole issue at trial — sanity — and that the purposes of Fed. R. Crim. P. 29.1 were not served because he had no chance to respond to the government's rebuttal argument, giving the government the last word on the subject on which he bore the burden of proof.

19

What Brown really means is that the district court plainly erred by not calling on him to give a rebuttal (or "surrebuttal") argument, which he did not request. Rule 29.1 gives the government the last word in closing arguments, and there is no precedent from the Supreme Court or this Court holding that Rule 29.1 does not apply just because a defendant asserts an insanity defense. It follows that any error was not plain. See United States v. Pantle, 637 F.3d 1172, 1174–75 (11th Cir. 2011) ("In order to be plain enough for the plain error rule, an asserted error must be clear from the plain meaning of a statute or constitutional provision, or from a holding of the Supreme Court or this Court.") (quotation marks omitted).[4] We need not address the other requirements of the plain error rule.

## B.

Brown contends that the prosecutor made impermissible comments during her closing argument, demeaned the defense and defense witnesses, mischaracterized evidence, and vouched for the credibility of government

---

[4] Although it has no bearing on our plain error review, we note that the Second and Eighth Circuits have held that a district court is not required to give a defendant a rebuttal closing argument just because he asserts an insanity defense. See United States v. Garcia, 94 F.3d 57, 63 (2d Cir. 1996) ("[A]t the time of the IDRA's enactment, and during the period of more than a decade that has passed since, Congress could have provided that a defendant asserting an insanity defense under the IDRA be afforded rebuttal closing argument had Congress deemed it appropriate to do so. It did not and we decline to read into the unambiguous language of Rule 29.1 such a provision."); United States v. Byrd, 834 F.2d 145, 147 (8th Cir. 1987) (holding that the district court did not err by denying the defendant an opportunity to have a rebuttal argument on the issue of insanity).

20

witnesses.  None of which Brown objected to.  So we review only for plain error.
See United States v. Merrill, 513 F.3d 1293, 1306-07 (11th Cir. 2008) ("[W]ith
respect to a prosecutor's statements made during closing where the defendant did
not raise this objection at trial, we review only for plain error that is so obvious that
failure to correct it would jeopardize the fairness and integrity of the trial.")
(quotation marks omitted).

Brown asserts that it was plain error for the district court to allow the
prosecutor to say in her in closing and in rebuttal closing arguments that his
insanity defense was based on the testimony of experts who were "hired and paid
for" by the defense and that those experts based their diagnosis of mental illness on
Brown's statements to them, even though he was "the person who stood to gain the
most" from being found insane.   All of that was, of course, true. Both the defense
and the government's experts testified on cross-examination that they were being
paid for their services and that their evaluations were based mainly on statements
made by Brown and his family and friends.  And Brown was the one who had the
most to gain from being found insane, which is why he pleaded that defense.

Not only that, but in his closing argument Brown's counsel attacked the
credibility of the government's expert, pointing to his testimony that he had made a
mistake in his expert report, he was not board certified, and he was "overworked."
Counsel argued:  "Where does this guy come from?  He works for the Federal

21

Government, works for insurance companies in private practice. Remember he told you, independent medical examiner. So he gets people — insurance companies don't have to pay for whatever jury they have, okay, he will go along with it, like he went along with it here." The district court did not plainly err by not acting on its own to stop the prosecutor's arguments about credibility. See United States v. Eley, 723 F.2d 1522, 1526 (11th Cir. 1984) ("Defense counsel in this case attacked the credibility of the government's witnesses and, in response, the prosecutor was entitled to argue fairly to the jury the credibility of the government and defense witnesses."). Brown has shown no "error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." Merrill, 513 F.3d at 1306–07 (quotation marks omitted).[5]

## V.

Brown also challenges his sentence, contending that the district court clearly erred by refusing to grant him a two-level reduction in his offense level for acceptance of responsibility. "The district court's determination of whether a defendant is entitled to a reduction for acceptance of responsibility under § 3E1.1(a) is a finding of fact that is entitled to great deference on appeal and will

---

[5] Brown also makes a cumulative error argument, but it fails because he has failed to establish that there were any errors.

22

not be disturbed unless clearly erroneous." United States v. Frank, 247 F.3d 1257, 1259 (11th Cir. 2001).

If a defendant "clearly demonstrates acceptance of responsibility for his offense," the district court may choose to reduce the offense level by two levels. U.S.S.G. § 3E1.1(a). The commentary to that guideline explains: "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." Id. cmt. n.5. And we have held that "[b]ecause demonstration of whether or not the defendant has personally accepted responsibility for his criminal conduct requires a consideration of both objective factors and subjective considerations of the defendant's demeanor and sincerity, the district court's determination will not be overturned unless it is without foundation." United States v. Castillo-Valencia, 917 F.2d 494, 500 (11th Cir. 1990).

At Brown's sentence hearing, the district court specifically stated that it had a "distinct recollection of the evidence that was presented during [Brown's] trial." The court noted that at trial Brown did not contest most of his actions but he did contest some factual points about certain aspects of his conduct. The court also referred to the evidence that Brown had committed prior armed robberies.

23

A refusal to grant an acceptance of responsibility reduction cannot be solely based on a defendant's decision to go to trial, Castillo-Valencia, 917 F.2d at 500, but choosing to go to trial is a factor that can be considered, id. at 500–01; see also U.S.S.G. 3E1.1 cmt. n.2 ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.") (emphasis added).  The district court considered the evidence presented at trial and the fact that Brown had contested certain factual aspects of his conduct.  The court did not clearly err in not applying an acceptance of responsibility reduction.

**AFFIRMED.**